Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PENNY PACE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> -against- <br><br> TIMOTHY QUINTANILLA, HENRY MENDOZA, BILL TORRES, JAMES FRANCIS BERGER, AND CINDY E. GONZALEZ, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.  SACV 14-02067-DOC (RNBx) <br><br> **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> JUDGE: Hon. David O. Carter |

1
FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

1.      Lead Plaintiffs George Zuzulock and William Weakley (together "EGMI Group") and Plaintiff Penny Pace (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: (a) review and analysis of relevant filings made by Electronic Game Card, Inc. ("EGC" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; (e) interviews of several witnesses with personal knowledge of the relevant facts; and (f) public filings in the SEC action, *SEC v. Lee Cole, et al.* 12-cv-8167(RJS)(S.D.N.Y ) (the "SEC Action").

2.      Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## I.      NATURE OF THE ACTION

3.      This is a class action on behalf of purchasers of the common stock of EGC (the "Class") between March 26, 2008 and February 19, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

4.      Defendants, partners in Mendoza Berger & Co., LLP ("M&B"), issued materially misleading "clean" or unqualified audit and interim reports for EGC's financial statements for fiscal years 2006, 2007, and 2008 as EGC's auditor

that were relied upon by investors during the Class Period. The audit reports were materially misleading as they contained financial statements provided to M&B by EGC that were doubtful but that M&B refused to investigate. These figures were proven false and fabricated.  The audit work performed by M&B for EGC fell so far below Public Company Accounting Oversight Board ("PCAOB") standards and Generally Accepted Auditing Standards ("GAAS") that it equated to no audit at all and resulted in PCAOB sanctions and an SEC enforcement action against the auditors. When they were investigated by the PCAOB, M&B altered their audit workpapers for already completed audits and tampered with their computers to backdate the changes and conceal their fraud.

5.     EGC purported to design and manufacture electronic "scratch off" devices for various casinos, lotteries and other gaming establishments primarily in the United Kingdom and Europe.  During the Class Period, nearly all of the Company's reported revenues and income were derived from its wholly-owned UK and European operating subsidiary, Electronic Game Card, Ltd. ("EGCL"). During the Class Period, EGC had no more than ten employees.

6.     EGC falsely reported incrementally increasing cash balances, starting at approximately $3.0 million at the beginning of the Class Period up to $12.7 million by the third quarter ended September 30, 2009—painting a picture of a financially successful and fast growing company.  In truth, EGC did not possess any of the millions of dollars it claimed were in its bank accounts.

7.     In connection with EGC's fiscal year ended December 31, 2009 audit, questions concerning the legitimacy of the Company's financial statements and cash balances began to bubble to the surface; and ultimately boiled over causing

EGC to file a Chapter 7 bankruptcy petition, and causing investors to lose their entire investment.

8.     On February 19, 2010, the SEC halted trading in the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

9.     That same day EGC announced that its auditor M&B had withdrawn its audit reports of EGC's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 because the auditor had "become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by [EGCL], a wholly owned subsidiary of [EGC]…".

10.     According to the SEC:

a.     Linden Boyne ("Boyne"), EGC's Chief Financial Officer, provided falsified audit confirmations for cash balances for years 2006 through 2008 to M&B, fraudulently representing that EGCL/EGC had a multi-million dollar bank account with Credit Suisse in Gibraltar (the "Credit Suisse Account").[1]

b.     According to Credit Suisse, the account referenced in Boyne's false confirmations, was not an account in the name of EGC or EGCL.  Credit

---

[1] Auditors use audit confirmations to confirm financial statement items such as cash balances as part of the audit process.  In normal circumstances, a signatory of a company's bank account would complete the confirmation form, i.e. fill in the bank address and details, account information and balance, and sign the form.  Then the company or an auditor would send the audit confirmation to the client's bank to confirm the company's cash balances.  The bank officer would then confirm the account balance is correct and send the confirmation of the account directly to the auditor.

Suisse confirmed that EGC had an account with it (a different account and different account number), but EGC's account *never* had any funds.

11.     UK company filings show EGCL had less than £768 of cash on its balance sheet as of December 31, 2008 and reported negative net assets.  The forged 2008 audit confirmation signed by Boyne is for EGCL, and lists over $8.8 million in cash held at Credit Suisse.

12.     On May 18, 2010, EGC announced its Board of Directors had concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because of "significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008."

13.     The May 18, 2010 announcement stated that "[EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated."

14.     The following day, in a May 19, 2010 announcement EGC confirmed that the Company's financial statements for the fiscal years ended 2006, 2007 and 2008 should no longer be relied upon and had to be restated.

15.     As a result, EGC's stock was delisted from the NASDAQ Bulletin Board and several former high level executives of the Company have resigned, asserting, among other things, that certain members of EGC's management have lied to, and concealed information from, investors, the SEC and the Company's auditor M&B.

16.     The adverse news that EGC's financial statements were false and misleading, along with EGC's subsequent bankruptcy filing, has caused investors to lose their entire investment in EGC.

17.   On November 8, 2012, the SEC filed a complaint against, among others, Timothy Quintanilla, in the United States District Court for the Southern District of New York for violations of the federal securities laws.  This complaint revealed to the public that Defendants' audit of EGC was so superficial and haphazard as to constitute no audit at all.  In particular, even a minimal adherence to audit procedures would have uncovered the fraudulent nature of the Credit Suisse Account and therefore identified EGC's fraud at the outset.

18.   On April 29, 2014, the SEC filed a motion for summary judgment against Quintanilla in the same action.

## II.   <u>JURISDICTION AND VENUE</u>

19.   The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20.   This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

21.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

22.   In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.   **PARTIES**

23.   Plaintiff Penny Pace purchased EGC common stock during the Class Period as set forth in her previously filed certification, (Docket No. 1) and has suffered damages as a result.

24.   Lead Plaintiff George Zuzulock purchased EGC common stock during the Class Period as set forth in his previously filed certification, (Docket No. 46-5) and has suffered damages as a result.

25.   Lead Plaintiff William Weakley purchased EGC common stock during the Class Period as set forth in his previously filed certification, (Docket No. 46-5) and has suffered damages as a result.

26.   Defendant Timothy Quintanilla resides in California. He is a certified public accountant licensed by the California Board of Accountancy.  During the Class Period, he was the engagement partner for the EGC account at M&B, a public accounting firm, which falsely certified EGC's year-end financial statements for 2006, 2007, and 2008.  Quintanilla began working at M&B in 2006 and brought along with him audit clients such as Advance Nanotech Inc., which was one of the public companies operated by Lee Cole and Linden Boyne, the executives of EGC. Due to their previous working relationship, Boyne contacted Quintanilla in or around August 2006 to audit EGC's 2006 financial statements.

27.   Defendant Henry Mendoza, upon information and belief, resides in California. He is a certified public accountant.  During the Class Period, he was a managing partner at M&B, and had more than 27 years in public accountngint.  His responsibilities included management of all services provided by the firm including auditing and accounting related services, consulting, administration, marketing, recruiting, and management of the firm.

28.     Defendant Bill Torres, upon information and belief, resides in California. He is a certified public accountant.  During the Class Period, he was a managing partner at M&B.  He has worked in consulting, compliance, and tax.  He has provided attorneys with tax advice to assist in structuring settlement proposals.

29.     Defendant James Francis Berger, upon information and belief, resides in California. He is a certified public accountant.  During the Class Period, he was a senior partner at M&B.  He was responsible for auditing and accounting related services, as well as all tax and consulting services provided by the firm.  He was responsible for planning and management of a wide range of engagements including tax preparation, audits, reviews and compilations, and special purpose reports.  He worked previously as a forensic accountant.

30.     Defendant Cindy E. Gonzalez, upon information and belief, resides in California. She is a certified public accountant.  During the Class Period, she was a partner at M&B responsible for tax matters, and had more than ten years of experience providing compliance services.

## IV.   RELEVANT ENTITIES AND INDIVIDUALS

31.     M&B was a public accounting firm during the Class Period.  M&B was registered with the PCAOB and the California Board of Accountancy.  M&B filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Central District of California on June 8, 2012. M&B issued clean audit reports for EGC's year-end financial statements for 2006, 2007, and 2008.

32.     EGC is a revoked Nevada corporation with principal executive offices located at 5405 Alton Parkway, Suite A-353 Irvine, CA 92604.  EGC designed and manufactured innovative "instant" win, extended play gaming device using patent

protected technology.  EGC's common stock was traded on the NASDAQ Bulletin Board under ticker "EGMI."

33.     Boyne served as EGC's Chief Financial Officer, Principal Accounting Officer, and Secretary from at least the beginning of the Class Period, and was an EGC Director since 2003, until his resignation from each of those positions on August 31, 2009. He was reappointed CFO and EGC's Secretary effective October 30, 2009 (but not Director) when his replacement Thomas Schiff resigned effective October 30, 2009. Boyne resigned from these remaining two positions on March 1, 2010. While a Director of EGC, Boyne also served on the Company's Audit Committee.

34.     Thomas Schiff ("Schiff") was appointed EGC's Chief Financial Officer on August 10, 2009 effective September 1, 2009.  He resigned October 31, 2009.

35.     Lee J. Cole ("Cole") was an EGC Director from 2003 until his resignation effective March 8, 2010. Cole served as EGC's the Chief Executive Officer ("CEO") from the beginning of the Class Period until he was replaced by Kevin Donovan on February 1, 2009. During his time with EGC, Cole served on the Company's Audit and Compensation committees.

36.     Kevin Donovan ("Donovan") served as EGC's Chief Executive Officer and Director from February 1, 2009 through the end of the Class Period. Following the death of EGC Chairman Lord Leonard Steinberg on November 2, 2009, Donovan was appointed as a member of the EGC's two-person Interim Office of the Chairman of EGC.

# V.     SUBSTANTIVE ALLEGATIONS
## A. Background

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

i.      **Defendants Issue Clean Audit Reports for EGC**

37.    The Class Period begins on March 26, 2008, when M&B issued a materially false audit report certifying the accuracy of EGC's financial statements in its annual report for the fiscal year ended December 31, 2007 on Form 10-KSB. The 10-KSB was false and misleading because EGC violated Generally Accepted Accounting Principles ("GAAP") by misrepresenting its assets and true financial condition in its financial statements.

38.    Included in the 10-KSB was M&B's unqualified audit report that stated that Defendants had conducted an audit of EGC's financial statements for the fiscal year ended December 31, 2007 in accordance with the standards of the PCAOB and that in M&B's opinion the consolidated financial statements "present fairly, in all material respects, the financial position of Electronic Game Card, Inc. as of December 31, 2007 and 2006 and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America" i.e., GAAP.

39.    On March 24, 2009 M&B issued a materially false audit report included in EGC's annual report certifying EGC's financial statements for the fiscal year ended December 31, 2008 on Form 10-K.  The 10-K was false and misleading because the Company failed to follow GAAP by misrepresenting its assets and true financial condition.

40.    Included in the 10-K was M&B's unqualified audit report that falsely stated that M&B had conducted an audit of EGC's financial statements for the fiscal year ended December 31, 2008 in accordance with the standards of the PCAOB and that, in M&B's opinion, the consolidated financial statements "present fairly, in all material respects, the financial position of Electronic Game

Card, Inc. as of December 31, 2008 and 2007 and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America," i.e. GAAP.

41.    Defendants are liable for violating the most fundamental principles of GAAS and the PCAOB in issuing its materially false and misleading unqualified audit reports regarding EGC's 2006, 2007, and 2008 financial statements.

42.    At the direction of engagement partner Quintanilla, Defendants issued their audit reports regarding EGC's 2006, 2007, and 2008 financial statements.

43.    Defendants knowingly or recklessly misrepresented that Defendants had conducted audits of EGC's financial statements in accordance with the standards of the PCAOB and that, in Defendants' opinion, those statements presented fairly, in all material respects, the financial position of EGC.

**B. Defendants Knowingly Failed to Audit EGC in Accordance with PCAOB Rules**

**ii.    Defendants Insufficiently Planned Before Conducting Their Audits of EGC**

44.    Under PCAOB Standard AU Section 311[2] (Planning and Supervision), an auditor must adequately plan the audit. Section 311 requires the auditor to obtain a level of knowledge of the entity's business sufficient to enable him to plan and perform his audit in accordance with PCAOB Standards. The auditor's knowledge should enable the auditor to obtain an understanding of the

---

[2] PCAOB Standards listed here are those that were in effect during the Class Period.  Some Standards listed here were amended during the class period – but those amendments had no substantive effect on the accounting obligations set forth here.

events, transactions, and practices that, in their judgment, may have a significant effect on the financial statements. Knowledge of the entity's business helps the auditor to identify areas that may need special consideration, assess conditions under which accounting data are produced, processed, reviewed and accumulated within the organization, and evaluate the reasonableness of management representations, among others. (AU § 311.06).  In planning the audit, among other considerations, an auditor should consider matters such as the entity's business, accounting policies and procedures and assessed level of control risk. (AU § 311.03).

45.    Under PCAOB Standards, Defendants' planning for the EGC audits was deficient for the auditing of an international, public company.

46.    In order to adequately conduct an audit, Defendants needed to assess conditions under which accounting data are produced, processed, reviewed and accumulated within the organization, and evaluate the reasonableness of management representations. They failed to do either and accordingly failed to abide by AU § 311.

47.    When they received documents from EGC, Defendants did not routinely review the documents to determine if any irregularities appeared on the face of the documents.  Even when Defendants did notice irregularities that called into question the authenticity of documents, they did nothing to investigate further.

48.    Furthermore, Defendants relied on EGC management's representations and supplemental evidentiary material when conducting the audits rather than obtaining independent investigation.

49.     Defendants failed to investigate the contradictions of management representations and consider the reliability of such representations in light of its contradiction as required by PCAOB Standards (AU § 333).

iii.    **Defendants Did Not Conduct a Fraud Review of EGC Workpapers with the Necessary Professional Skepticism**

50.     Under PCAOB Standard AU Section 316 (Consideration of Fraud in a Financial Statement Audit), an auditor is required to plan an audit "to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." Pursuant to this standard, the auditor should discuss among engagement personnel the risk of material misstatement due to fraud, and obtain information needed to identify such risk, including making inquiries of management and others within the company regarding such risk. (AU § 316, at .14-.27). The auditor also should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition. (AU § 316.41).  Under PCAOB Standard AU Section 230 (Due Professional Care in the Performance of Work), auditors are required to exercise due professional care throughout the audit. Due professional care requires that the auditor exercise professional skepticism. Under this standard, "[p]rofessional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."

a.      *Defendants Did Not Investigate Cash Confirmations that Contained Indicia of Fraud*

51.     According to the SEC:

a.      EGC reported that between 71% and 91% of EGC's total assets in the years ending 2006, 2007, and 2008 was kept in cash in the Credit Suisse

Account. This account supposedly was EGC's operating account and therefore almost every financial transaction that EGC conducted should have been reflected in the account.

b.      Defendants failed to obtain sufficient independent evidentiary support for EGC's representations regarding the Credit Suisse Account.

c.      For the 2006 Audit, Defendants identified as one of the steps in the audit: "Obtain the bank reconciliation for significant bank accounts for the workpapers."   M&B then requested that EGC provide "bank reconciliations for all bank accounts with supporting documentation as of December 31, 2006," and "all bank statements from January 1, 2006 to December 31, 2006." Yet, when the SEC examined M&B work papers, they did not find a bank statement or bank statement reconciliation for the Credit Suisse Account for any period during 2006.    M&B also specifically requested a confirmation of the Credit Suisse Account balance but did not receive it until April 2, 2007, two days after M&B's audit report for 2006. This confirmation had a balance of $2,708,107.65.   Yet, the balance reported on M&B's cash lead sheet and general ledger was $3,030,107.65.  M&B's workpapers do not include any analysis or explanation of the difference in these figures.

d.      There is also evidence within M&B's work papers that showed that EGC's financial statements with respect to the Credit Suisse Account are inaccurate.   EGC's general ledger included account transfers of $80,000 and $300,000 from the Credit Suisse Account to an EGC Account with Bank of America (the "BoA Account").  Yet, the BoA Account's bank statement stated that the $80,000 came from an account belonging to Bioaccelerate, Inc.  Bioaccelerate, Inc. was owned by Bioaccelerate Holdings, Inc.   The CEO of Bioaccelerate Holdings Inc. is Lee Cole and the CFO is Linden Boyne.  There is also a $45,000

payment to EGC in its general ledger which is referred to as a sales receipt. This money also came from the same Bioaccelerate account. Therefore, it was apparent from the documents within M&B's possession that the General Ledger did not accurately describe the activities of the Credit Suisse Account because the transactions in the BofA Account statements contradicted transactions in the General Ledger.

e.      During the 2006 audit, in violation of PCAOB auditing standards, Defendants issued a clean audit report when they did not obtain a bank statement and reconciliation for the Credit Suisse account. Rather, after the audit report was issued, Defendants only obtained a faxed bank statement. The faxed statement had a balance of $2,708,107.65 which did not match the account balance of $3,030,107.65 reported by EGC's general ledger. Audit standards are clear that auditors should be skeptical of faxed confirmations, yet Defendants took no additional steps to confirm authenticity or otherwise address such risks. AU § 330.29.

f.      Despite these deficiencies, Steven Valdes, an M&B auditor, authorized the "Audit Program for Cash" that should have, but did not, satisfactorily address these issues as required by PCAOB auditing standards. Even worse, M&B issued its audit report 15 days before Valdes reviewed and authorized the deficient Audit Program for Cash, meaning M&B issued its audit report 15 days before all the required audit programs had been completed, a clear violation of PCAOB auditing standards.

g.      In 2007, M&B's Audit Program for Cash included the step "Obtain the bank reconciliation for significant bank accounts for the workpapers." While M&B requested the Credit Suisse Bank statements for the relevant period

for the 2007 audit, it never received such statements, yet issued its audit report certifying EGC's 2007 financial statements.

h.  EGC's general ledger included entries reflecting $50,000 and $700,000 bank transfers from the Credit Suisse account to the BoA account.  Yet the relevant BoA account statements list an account number that belongs to Carlton Capital Inc.  Carlton Capital Inc. was an entity that Cole and Boyne covertly used to sell unregistered shares of EGC stock.

i.  On March 11, 2009, M&B finally received a bank statement for the Credit Suisse Account.  EGC's general ledger for the Credit Suisse Account included an entry for $589,095 that was not reflected in the Credit Suisse Account statement.

j.  On two occasions in 2009, M&B received purported Credit Suisse Account bank statements that were in MS Word ".doc" format.  M&B auditor Maratha Thio noticed one of the statements and brought it to the attention of Quintanilla.  Quintanilla acknowledged that this was strange.  Schiff told the SEC that he questioned whether the account statement was accurate.

k.  EGC's general ledger, which was included in Defendants' workpapers, recorded several large transfers between the Credit Suisse account and other smaller accounts at BoA and Clydesdale Bank. However, according to the BoA and Clydesdale account statements, the money did not come from the Credit Suisse account but rather another off-balance sheet bank account held by entities run by Cole and Boyne.

l.  In January 2010, EGC CEO Donovan contacted employees at Credit Suisse in Gibraltar to inquire about accounts opened by EGC and attached the faxes and Word documents that Defendants used in their audits. Credit Suisse

wrote back to Donovan saying that "we can confirm that the attachments you included in your earlier emails today…have not been produced by Credit Suisse (Gibraltar) Ltd." and "we will be reporting this matter officially to the Royal Gibraltar Police – Financial Crime Unit."

### b.  Defendants Did Not Investigate Highly Suspicious and Questionable Revenues and Accounts Receivables

52.   Revenue is the top line item on an income statement and represents actual or reliably predicted cash flows a company has earned from producing goods or providing services.  Accounts Receivables ("ARs") are found on a balance sheet and represent expected cash receipts from prior sales or other transactions that have not yet been received.

53.   According to AU Section 316, an audit must presume there is a risk of material misstatement arising from fraudulent revenue and receivables, which are both related to revenue recognition.

54.   According to AU Section 330.34 "there is a presumption that the auditor will request the confirmation of accounts receivable during an audit." A confirmation should be performed by contacting third parties directly, such as EGC's clients, to verify the terms and status of the transaction.

55.   According to the SEC:

a.    Defendants' audit procedures required audit confirmations for ARs. However, there is no evidence that the Defendants' audit team even sent out one request for confirmation for ARs balances during the 2006 audit.

b.    Furthermore, in the 2006 audit, Defendants only had a list of ARs given to them by EGC directly – M&B had no independent confirmation of the ARs.  In early 2007, Defendants attempted to contact the six EGC customers

with outstanding balances as of the end of the year. In M&B's workpapers, Defendants reported that three of those six customers confirmed the balance. These confirmations only accounted for 34% of the approximately outstanding $2.3 million of ARs at December 31, 2007. However only one of these confirmation forms appears in Defendants' workpapers. M&B's failure to keep confirmations, when they relied on such evidence in forming their audit reports, is a violation of PCAOB auditing standards and indicates that the assertion that M&B received confirmations from three customers is false.

c. Many of the invoices sent to various clients by EGC included identical terms and the clients were clustered in two addresses in Gibraltar. Qintanilla and Tillotson were unable to locate any information on most customers on the internet, but engaged in no additional audit steps.

d. The sole confirmation in Defendants' workpapers was dubious - it was sent to EGC customer Prize Mobile, but the purported address for Prize Mobile matched EGC's address in London. The Confirmation purported to confirm a balance due not from Prize Mobile, but from Poker Winning Seats Ltd. These factors alone should have put M&B on alert and triggered further investigation.

e. Defendants attempted to confirm balances for all of EGC's customers in 2008. Three of the customers, comprising 32% of the year-end ARs never responded. Instead of making further attempts to obtain confirmation, Defendants relied upon data from EGC's accounting system to finalize its audit.

f. When Defendants did receive confirmations, they inexplicably added together invoices in different currencies without converting currencies first. The confirmations were in either U.S. dollars or British pounds. Defendants added

the invoices in dollars and invoices in pounds without converting one currency to the other.  At that time, 1.98 pounds was equal to 1 dollar.  M&B added pounds and dollars to get a total in pounds, and then matched this total of pounds to the total of dollars reported in the financial statements without doing any conversion. These calculations are grossly inaccurate and drastically impact the accuracy of the financial statements.

> c.    *Defendants Knew That EGC Did Not File Federal or State Tax Returns*

56.    EGC's 2006 Form 10-KSB stated that "[t]he Company is subject to income taxes in the United States of America, United Kingdom, and the state of New York. As of December 31, 2006, the Company had a net operating loss carry forward for income tax reporting purposes of approximately $17,444,213 in the United States and $5,714,249 in the United Kingdom that may be offset against future taxable income through 2023."

57.    EGC's 2007 Form 10-KSB stated that "[t]he Company is subject to income taxes in the United States of America, United Kingdom, and the state of New York. As of December 31, 2007, the Company had a net operating loss carry forward for income tax reporting purposes of approximately $17,444,213 in the United States and $5,714,249 in the United Kingdom that may be offset against future taxable income through 2023."

58.    EGC's 2008 Form 10-K states that EGC "is subject to income taxes in the United States of America, United Kingdom, and the state of New York. As of December 31, 2008, the Company had a net operating loss carry forward for income tax purposes of approximately $11,945,052 in the United States … that may be offset against future taxable income through 2023."

59.    According to the SEC:

a.    The figures from these statements for the years ending December 31 2006, 2007 and 2008 are false.

b.    EGC did not file any federal or state tax returns during at least between 2003 and 2009.

c.    Quintanilla learned that EGC had not been filing taxes in January 2009, two months before the 2008 audit reports was due.

d.    EGC hired Defendants to prepare the delinquent tax returns in January 2009.

e.    Despite knowing that the 10-K and 10-KSBs and financial statements were inaccurate because of the representation of paying federal and state taxes, Quintanilla issued a clean audit report.

f.    Defendants not only had actual knowledge that EGC did not file taxes before the 2008 audit report was due, but they should have consistently confirmed that EGC had been paying its taxes during the 2006 and 2007 audits. Especially once Defendants received the information that the taxes were not filed for 2008, Defendants had the responsibility to confirm past audits immediately.

iv.    **Defendants Had Insufficient Evidentiary Material to Abide by PCAOB Standards**

60.    Under PCAOB Standards AU Sections 326 and 150.02(3) (Evidential Matter), an auditor is required to obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. In developing his opinion, an auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial

statements. (AU § 326.25). PCAOB Standards also state that evidential matter obtained from independent sources outside the entity provides greater assurance of reliability than information obtained solely within the entity. (AU § 326.21). In addressing an identified risk of material misstatement due to fraud, an auditor may need to change the nature, timing and extent of auditing procedures to obtain evidence that is more reliable or to obtain additional corroborative information. For example, more evidential matter may be needed from independent sources outside the audited entity, such as information from public records about the existence and nature of key customers, vendors, or counterparties in a major transaction. (AU § 316.52). Under PCAOB Standard AU Section 330 (The Confirmation Process at .28), an auditor performing confirmation procedures should establish direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses.

61.    According to the SEC:

a.    Defendants did not perform any fieldwork in connection with the 2006 and 2007 audits of EGC.  Fieldwork involves going to the client's offices, communicating with and questioning management, reading through the client's original copies of books, records, and accounting systems, and contacting third parties when necessary to confirm evidence given by management.

b.    Conducting an audit by phone or email requires auditors to rely on clients to provide documents and does not allow auditors to review all supporting materials for financial statements.  Such audits are inadequate in the absence of fieldwork.

c.      No evidence was collected and examined during the 2006, 2007 or 2008 audits to verify EGC's revenue or assets. Therefore Defendants did not meet the standard of AU § 326.

v.      **Defendants Did Not Adequately Staff Proficient Auditors or Provide Proper Supervisions on EGC Audits**

62.      Under PCAOB Standard AU Section 210 (Training and Proficiency of the Independent Auditor) an auditor is required to have "adequate technical training and proficiency as an auditor." An auditor must have the proper formal education and experience in the area of auditing.

63.      According to the SEC:

a.      Defendants failed to adequately staff EGC's audits. PCAOB standards require that audits be performed by personnel with the requisite technical training and proficiency as an auditor (AU § 210). Besides Quintanilla, the lead staffer, the only other staff for the 2008 audit of EGC was a junior auditor with only two years of experience and no CPA license.

b.      Furthermore, Quintanilla himself was unqualified to conduct the 2006, 2007, and 2008 audits, a fact that was admitted by Quintanilla's own expert in the SEC action.

c.      Berger was the concurring partner for the EGC audits.  He did no work on the audits until it was too late to prevent EGC's fraud – and in fact did not produce substantive comments on what should have been done differently in the audit until after M&B pulled its audit reports.

vi.      **Defendants Did Not Properly Document The Audit Process of EGC And Because of This Deficiency Engaged in a Cover Up**

64.      According to the SEC:

a.      Defendants did not ensure that all audits conformed to PCAOB standards as they were conducting the audits.  Instead, Defendants waited until they learned what audit files the PCAOB were planning to inspect, and then reviewed the audits, and covered up any deficiencies by altering their workpapers and backdating the changes.  Backdating electronic files required M&B personnel to first adjust the system date on the computer.  This practice was endorsed by Mendoza.  This was a general practice at M&B and not limited to EGC.

b.      Quintanilla backdated and modified, and instructed others to modify and backdate, audit workpapers in the months after issuing the 2008 audit reports  and shortly before a PCAOB inspection began in September of 2009.

c.      On August 27, 2009, Quintanilla sent an email instructing Jonathan Tillotson, a junior employee of M&B, to change 11 of the workpapers from the 2008 audit, including a sales concentration worksheet, client information form, audit program for general planning procedures, and bad debt expenses analysis.

d.      On September 16, 2009, Quintanilla sent an email instructing Tillotson to change 18 audit workpapers from the 2008 audit, including workpapers concerning fixed assets, accounts payable, and investments.

e.      In both instances Tillotson acted on these directives.

vii.   **Defendants did not Verify Shareholder Equity**

65.    According to the SEC:

a.      As part of the audit, M&B was required to determine the number of authorized shares and the number of shares issued and outstanding.  This only required contacting EGC's stock transfer agent.

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

b.     Defendants did not contact the transfer agent for confirmation in either 2007 or 2008.

**C. Defendants' Statements Concerning Compliance with PCAOB and GAAP Standards were False**

66.     Defendants' statements in the 2006, 2007, and 2008 10-Ks that M&B "conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board" was false due to the numerous failures to meet PCAOB standards set forth above.  Audit reports on public company financial statements are material to investors in that they allow investors to rely on financial statements and assess the viability of a public company.

67.     Defendants' statement that the EGC's financial statements "present fairly, in all material respects, the financial position of [EGC] … in conformity with accounting principles generally accepted in the United States Of America" was false.

68.     According to the SEC, Quintanilla conceded that EGC's "financial statements from 2006 to 2009 were fraudulent."

69.     Quintanilla's attempt to backdate changes to the audit demonstrates the subjective falsity of the audit reports.

**D. Loss Causation and Damages**

70.     Schiff was appointed as EGC's CFO in August 2009. It took him a few short weeks to begin to have serious concerns about the validity EGC's financial statements based on a few documents he received from Defendants. By October 28, 2009 Schiff reported these serious issues to EGC's Audit Committee. Schiff stepped down as CFO on October 30, 2009.

71.   On November 16, 2009, the Company filed with the SEC on Form 12b-25 a notification of late filing for the Company's third quarter ended September 30, 2009 10-Q.  The notification states in relevant part:

> The Registrant's annual report on Form 10-Q could not be filed within the prescribed time period due to the Registrant and its accountants requiring additional time to prepare and review the financial statements of the Registrant for the period ended September 30, 2009. Such delay could not be eliminated by the Company without unreasonable effort and expense. In accordance with Rule 12b-25 of the Securities Exchange Act of 1934, the Company will file its Form 10-Q no later than the fifth calendar day following the prescribed due date.

72.   This announcement caused the Company stock to fall $.15 per share, or 8%, to $1.70 per share through November 17, 2009.

73.   On February 10, 2010 the Company issued a press release announcing it was rescheduling a conference call with investors scheduled for that day to February 25, 2010.  The conference call was originally announced in the Company's February 1, 2010 press release to "Update Investors on Company Progress."

74.   The February 10, 2010 announcement caused the Company's stock to fall $.17 per share, or 15.8%, to $.901 per share on February 10, 2010.

75.   On February 12, 2010 it was announced after market close that Merriman Curhan Ford & Co. downgraded the Company's stock from a "Buy" recommendation to "Neutral."  The announcement caused the Company's stock to fall from $.91 to $.83 per share, or 8.8%.

76.    On February 19, 2010 trading in the Company's stock was temporarily suspended by the SEC "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."  The SEC's release states in relevant part:

SECURITIES EXCHANGE ACT OF 1934

Release No. 61544 / February 19, 2010

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of [EGC], of Irvine, California, at 9:30 a.m. on February 19, 2010, and terminating at 11:59 p.m. on March 4, 2010.

The Commission temporarily suspended trading in the securities of [EGC] because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets.

77.    The last trade price of the Company's stock immediately prior to the trading halt was $.88 per share.

78.    On February 19, 2010 the Company filed an 8-K with the SEC announcing that that its auditor, M&B, on February 12, 2010[3] withdrew its clean audit reports for the Company's financial statements for the years ended December 31, 2006, 2007 and 2008.  The stated reason for this action was M&B becoming aware of irregularities in the audit confirmation of a bank account represented to

---

[3]  See footnote no. 2.

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

M&B as having been held by EGCL and M&B's investigation and inability to confirm the balances in the account.  The announcement states in relevant part:

> Item 4.02    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report.
>
> (b) On February 12, [2010], Mendoza Berger and Company, LLP ("M&B"), the independent auditors for [EGC], informed the [EGC] Board of Directors that it had withdrawn its audit opinions for [EGC's] financial statements for the years ended December 31, 2006, 2007 and 2008.
>
> M&B advised [EGC] that it had become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by Electronic Game Card (UK) Limited ("EGC Ltd"), a wholly owned subsidiary of [EGC] that conducts its European operations.  Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC's] financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.
>
> Kevin Donovan, the Chief Executive Officer of [EGC],  has discussed all matters described above with M&B, and has provided a copy of this Form 8-K to M&B.

79.    In the February 19, 2010 8-K, the Company also explained that the Company would determine the necessary adjustment and reissue corrected financial statements for the fiscal years ended 2006, 2007, 2008, and the first three quarters of 2009.  The 8-K states in relevant part:

[EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

80.   On February 24, 2010, the Company issued a press release announcing it had postponed the shareholder conference call with investors scheduled for February 25, 2010 (per the Company's February 10, 2010 press release above) "due to the suspension of trading of its common shares.   The Company noted that it "is working diligently with its independent auditor to address the situation and will update investors as soon as possible."

81.   On March 5, 2010 the Company's shares began trading again with an opening price of $.25 per share.  The last trade immediately prior to the halt was $.88 per share.

82.   During the afternoon of March 5, 2010, the Company issued a press release announcing that it "believes that there will be no material change to the Company's net asset value upon the completion of the review of its financial statement by its independent accountant."

83.   Notwithstanding the false reassurances from the Company, the Company's stock closed at $.44 per share on March 5, 2010 down, $.44 per share, or 50%, from its previous closing price.  The Company's stock fell an additional $.10 per share, or 22.7%, the following trading day.

84.   The March 5, 2010 assurance was materially false and misleading because on March 1, 2010 EGC no longer owned the share capital of EGCL, and

an entity named EPN Advisors Limited owned all the share capital of EGCL (*See* Exhibit 2).  Defendants never disclosed this to investors.

85.    On March 19, 2010, the Company issued a press release which revealed the dire financial situation of the Company.  The announcement stated that the Company had engaged G.C. Andersen Partners, LLC, to serve as the Company's strategic and financial advisor.  According the announcement, "[d]ue to EGC's state of affairs, one of Andersen Partners' first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries."

86.    Commenting on the engagement of G.C. Andersen Partners in the press release defendant Donovan stated:

> Kevin Donovan, CEO and Interim Joint Chairman of Electronic Game Card, Inc., said, "Having the support of an experienced advisor such as G.C. Andersen Partners will allow us to review our operations and identify the most advantageous options for the Company and its shareholders going forward."

87.    This announcement caused the Company's stock to fall $.17 per share, or 13.6%, to $.18 per share on March 19, 2010.

88.    On May 18, 2010, after market close, the Company issued a press release entitled "Electronic Game Card, Inc. Provides Stockholder Update" which provided additional and new information about the Company's financial statements.  The press release states in relevant part:

> IRVINE, CA, – May 18, 2010 - Electronic Game Card, Inc. provided the following update to its stockholders.

The investigation into [EGC's] financial position is continuing. However, preliminary findings have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008. [EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated.

In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). While a former CFO (and director) of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC]. The current [EGC] Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.

With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in

[EGC] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission (the "SEC").

[EGC] continues to investigate these matters. The SEC, which suspended trading in [EGC] stock for two weeks starting on February 19, 2010, also continues to investigate. [EGC] continues to explore its strategic options, which may include filing for bankruptcy protection.

89.    On May 19, 2010 the Company filed with the SEC an 8-K which attached the May 18, 2010 press release and stated that on May 18, 2010 that "the Board of Directors of Electronic Game Card, Inc. [EGC] concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because preliminarily findings of its previously announced forensic review of the circumstances that gave rise to [EGC's] independent auditors withdrawal of its audit opinions… ."

90.    The adverse information in these disclosures caused the Company's stock to fall $.09 per share, or 75%, to $.03 per share on May 19, 2010.

91.    Since May 19, 2010, the Company has gone "dark." The Company has not issued a single press release or made any SEC filings.  The price of the Company's stock has drifted downward.  As of September 7, 2010, the Company's stock closed at 1 cent per share and had a market capitalization of approximately $550,000, compared to a class period high of $2.20 per share and market capitalization of over $100 million.

**E. Defendants' Role in the Fraud is Exposed**

92.    On November 8, 2012 the SEC filed a complaint against, among others, Timothy Quintanilla, in the United District Court for the Southern District of New York for violations of the federal securities laws.

93.     Defendants knew that their audits fell well below PCAOB standards, rendering their statements to the contrary in their audit reports in EGC's 10-Ks deliberately false and misleading.

## VI.     CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired EGC common stock during the Class Period and who were damaged thereby.  Excluded from the Class are the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns; also excluded from the Class are Defendants and the current and former partners of M&B, members of their immediate families and their legal representatives, heirs, successors or assigns; also excluded is any entity in which any of the above excluded persons or entities have or had a controlling interest.

95.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EGC's securities were actively traded on the NASDAQ Bulletin Board. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by EGC or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

96.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct

that occurred in violation of the federal securities laws and that is complained of herein.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiffs have engaged competent counsel experienced in securities class actions and complex litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

99.     Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts alleged herein;

b.     whether statements made by M&B and Quintanilla to the investing public during the Class Period misrepresented material facts about the business, operations and management of EGC;

c.     whether Defendants failed to include material facts in the financial statements issued during the Class Period, making those filings materially false and misleading;

d.     whether Defendants  acted with the required state of mind;

e.     to what extent the members of the Class have sustained damages and the proper measure of damages; and

f.     whether the Defendants are controlling persons.

100.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, since the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

101.   At all relevant times, the market for EGC's securities was an efficient market for the following reasons, among others:

a.   EGC's stock met the requirements for listing, and was listed and actively traded on NASDAQ Bulletin Board at all relevant times, a highly efficient and automated market;

b.   As a regulated issuer, EGC filed periodic public reports with the SEC;

c.   During the class period, on average, more than 1.8 million shares of EGC common stock were traded on a weekly basis.  During the Class Period approximately 57.0 million shares were outstanding (per the Company's fiscal year 2008 10-K).  Approximately 3.23%  of all outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

d.   EGMI was eligible to file SEC form S-3 during the class period.

e.   EGC was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

f.     At least 50 NASD member firms were active market-makers in EGC stock at all times during the Class Period;

g.     Unexpected material news about EGC was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

h.     EGC regularly communicated with public investors via established market communication mechanisms, including, but not limited to, the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

102.   As a result of the foregoing, the market for EGC's securities promptly digested current information regarding EGC from all publicly available sources and reflected that information in EGC's stock price. Under these circumstances, all purchasers of EGC's securities during the Class Period suffered similar injury through their purchase of EGC's securities at artificially-inflated prices and a presumption of reliance applies.

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF

### THE EXCHANGE ACT AND RULE 10b-5

### PROMULGATED THEREUNDER AGAINST DEFENDANTS

103.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

104.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

EGC securities at artificially inflated prices during the Class Period.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

105.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for EGC securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

106.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of EGC as specified herein.

107.   Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EGC value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about EGC and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth

more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of EGC's securities during the Class Period.

108.   Defendants' Quintanilla and Berger's   primary liability, and controlling person liability in the case of all Defendants, arise from the following facts: (i) Defendants are partners of M&B; (ii) by virtue of their responsibilities and activities as partners of M&B, Defendants were privy to and participated in the creation, development and reporting of M&B's audit reports; (iii) the Defendants enjoyed significant personal contact and familiarity with the other partners of M&B; and (iv) the Defendants were aware of the M&B's issuance of its audit reports, relating to EGC's financial statements, to the investing public which they knew or recklessly disregarded was materially false and misleading.

109.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing EGC's financial condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

110.   Defendants consented to the incorporation of M&B's   unqualified auditor's report regarding EGC's financial statements into the Company's 2006,

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

2007, and 2008 Form 10-KSB.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Form 10-KSBs included the fact that:  (i) the financial statements that Defendants certified as being presented in conformity with GAAP were not presented in conformity with GAAP, and (ii) Defendants' audit, which it attested was conducted in accordance with GAAS, was conducted in violation of GAAS.

111.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of EGC securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of EGC publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants,  or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EGC securities during the Class Period at artificially high prices and were damaged thereby.

112.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that EGC was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their EGC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

113.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

114.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**VIOLATION OF SECTION 20(a) OF**

**THE EXCHANGE ACT AGAINST ALL DEFENDANTS**

115.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116.   Defendants acted as controlling persons of M&B within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and rights due to their being partners of M&B, participation in and/or awareness of M&B's operations and/or intimate knowledge of the false statements made by M&B with the SEC and disseminated to the investing public, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Defendants including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Defendants were provided with or had unlimited access to copies of M&B's audit reports and work papers and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

117.   Moreover, the Defendants had direct and supervisory involvement in the day-to-day operations of M&B and, therefore, are presumed to have had the power to control or influence the issuance of the audit reports giving rise to the securities violations as alleged herein, and exercised the same.

118.   As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of Defendants' positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities at artificially inflated prices during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;(c)  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and(d)  Such other and further relief as the Court may deem just and proper.

# VIII. <u>JURY TRIAL DEMANDED</u>

FIRST AMENDED COMPLAINT—Civil Action No. SACV 14-02067 DOC (RNBx)

1    Plaintiffs hereby demand a trial by jury.

2

3    Dated:  October 14, 2014                    Respectfully submitted,

4                                                **THE ROSEN LAW FIRM, P.A.**

5                                                /s/ Jonathan Stern
                                                Laurence M. Rosen, Esq. (SBN 219683)
6                                                355 South Grand Avenue, Suite 2450
                                                Los Angeles, CA 90071
7                                                Telephone: (213) 785-2610
                                                Facsimile: (213) 226-4684
8                                                Email: lrosen@rosenlegal.com

9

10                                               -and-

11
                                                Jonathan Stern, Esq. (*Pro Hac Vice*)
12                                               THE ROSEN LAW FIRM, P.A.
13                                               275 Madison Avenue, 34th Floor
                                                New York, New York 10016
14                                               Telephone: (212) 686-1060
15                                               Facsimile: (212) 202-3827
                                                Email: jstern@rosenlegal.com
16

17                                               Lead Counsel for Plaintiffs

18

19

20

21

22

23

24

25

26                                               41

28